IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSEDALE PLAZA GROUP, LLC, ) | No. CV-F-08-1874 OWW/GSA |
| ) | |
| ) | MEMORANDUM DECISION AND |
| ) | ORDER DENYING CROSS MOTIONS |
| Plaintiff, ) | FOR SUMMARY JUDGMENT (Docs. |
| ) | 37 & 41) |
| vs. ) | |
| ) | |
| ) | |
| BP WEST COAST PROCDUCTS LLC, ) | |
| ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____) | |

Plaintiff Rosedale Plaza Group, LLC (hereafter referred to as Rosedale) has filed a Complaint for injunctive and/or declaratory relief and damages against Defendant BP West Coast Products LLC (hereafter referred to as BP) for BP's allegedly wrongful refusal to renew or wrongful termination of a Contract Dealer Gasoline Agreement (sometimes referred to by Rosedale as the PMPA Gasoline Franchise) in violation of the Petroleum Marketing Practices Act, (PMPA), 15 U.S.C. § 2801 *et seq.* by requiring Rosedale to also execute an am/pm convenience store franchise agreement.  BP has filed a counterclaim for declaratory

1

1  relief that BP's "termination/nonrenewal of the franchise

2  relationship is legal and enforceable pursuant to the Dealer

3  Agreements, the *am/pm* Mini Market Agreements, and state and

4  federal law, including without limitation the PMPA ... and that

5  Rosedale has no legal right to purchase ARCO branded gasoline or

6  display any of the ARCO marks, trademarks, trade name, and trade

7  dress."

8      On July 9, 2009, a Preliminary Injunction was issued

9  requiring the parties *inter alia* to comply with all terms and

10  conditions of the *am/pm* Mini Market Agreement and the Contract

11  Dealer Gasoline Agreement as if those agreements were in full

12  force and effect.

13     Rosedale and BP have filed cross-motions for summary

14  judgment and/or summary adjudication whether: (1) BP had the

15  legal right to require Rosedale, as a condition of renewal of its

16  franchise relationship with BP, to renew its entire Renewal

17  Contracts, which included an *am/pm* Mini-Market Agreement and a

18  PMPA Gas Agreement; (2) whether BP's decision to require its

19  franchisees with expiring *am/pm* Mini Market Agreements and PMPA

20  Gasoline Agreements to renew both agreements if they wished to

21  continue a PMPA franchise relationship, was made in good faith

22  and in the normal course of business; and (3) whether BP's Notice

23  of Termination met the PMPA's procedural requirements under 15

24  U.S.C. § 2804.

25     The parties' cross motions for summary judgment are DENIED;

26  material issues of disputed fact exist which preclude summary

judgment for either party.

A.  <u>GOVERNING STANDARDS</u>.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  Materiality is determined by the substantive law governing a claim or a defense.  *Id*.  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id*.

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial." *Id*.  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant

3

probative evidence tending to support the complaint." *Id*. The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995). This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id*. The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id*. As explained in *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099 (9th Cir.2000):

> The vocabulary used for discussing summary judgments is somewhat abstract. Because either a plaintiff or a defendant can move for summary judgment, we customarily refer to the moving and nonmoving party rather than to plaintiff and defendant. Further, because either plaintiff or defendant can have the ultimate burden of persuasion at trial, we refer to the party with and without the ultimate burden of persuasion at trial rather than to plaintiff and defendant. Finally, we distinguish among the initial burden of production and two kinds of ultimate burdens of persuasion: The initial burden of production refers to the burden of producing evidence, or showing the absence of evidence, on the motion for summary judgment; the ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial.

> A moving party without the ultimate burden of persuasion at trial - usually, but not always, a defendant - has both the initial

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

> burden of production and the ultimate burden
> of persuasion on a motion for summary
> judgment ... In order to carry its burden of
> production, the moving party must either
> produce evidence negating an essential
> element of the nonmoving party's claim or
> defense or show that the nonmoving party does
> not have enough evidence of an essential
> element to carry its ultimate burden of
> persuasion at trial ... In order to carry its
> ultimate burden of persuasion on the motion,
> the moving party must persuade the court that
> there is no genuine issue of material fact
> ....
>
> If a moving party fails to carry its initial
> burden of production, the nonmoving party has
> no obligation to produce anything, even if
> the nonmoving party would have the ultimate
> burden of persuasion at trial ... In such a
> case, the nonmoving party may defeat the
> motion for summary judgment without producing
> anything ... If, however, a moving party
> carries its burden of production, the
> nonmoving party must produce evidence to
> support its claim or defense ... If the
> nonmoving party fails to produce enough
> evidence to create a genuine issue of
> material fact, the moving party wins the
> motion for summary judgment ... But if the
> nonmoving party produces enough evidence to
> create a genuine issue of material fact, the
> nonmoving party defeats the motion.

18  **210 F.3d at 1102-1103.**

19      **B.**   <u>**VIOLATION OF PMPA**</u>**.**

20      **Rosedale moves for summary judgment on the ground that BP**

21  **cannot require renewal of Rosedale's PMPA motor fuel franchise**

22  **agreement upon the the condition that Rosedale, a PMPA protected**

23  **franchisee, also enter into a "non-motor fuel, non-necessary,**

24  **mini market convenience store franchise agreement." BP cross-**

25  **moves for summary judgment that it had the legal right to require**

26  **Rosedale, as a condition of renewal of its franchise relationship**

with BP, to renew all BP's Renewal Contracts, which included an *am/pm* Mini-Market Agreement and a PMPA Gas Agreement.

"The PMPA is intended to protect gas station franchise owners from arbitrary termination or nonrenewal of their franchises with large oil corporations and gasoline distributors, and to remedy the disparity in bargaining power between parties to gasoline franchise contracts." *DuFresne's Auto Service, Inc. v. Shell Oil Co.*, 992 F.2d 920, 925 (9th Cir.1993). 15 U.S.C. § 2802 precludes franchisors from terminating any franchise or failing to renew any franchise relationship unless notification requirements are met and the termination or nonrenewal is based on specified grounds. *Id.* Section 2802 states:

(a) Except as provided in subsection (b) of this section ..., no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may -

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

(b)(1) Any franchisor may terminate any franchise ... or may fail to renew any franchise relationship, if -

(A) the notification requirements of section 2804 are met; and

(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

6

The PMPA distinguishes between a "franchise" and a "franchise relationship."  A "franchise" is a contract between a refiner and a retailer, or between a distributor and a retailer, under which the refiner or distributor permits the retailer to use the refiner's trademark in connection with the sale of motor fuel or premises to be used for motor fuel sales.  *DuFresne's Auto Service, Inc., id.*, at 925; 15 U.S.C. § 2801(1)(A).  A "franchise relationship" means "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and franchisee which result from the marketing of motor fuel under a franchise."  *Id.*; 15 U.S.C. § 2801(2).

There is no dispute that a franchise and franchise relationship existed between Rosedale and BP.

Grounds for termination of a franchise or nonrenewal of a franchise relationship are set forth in Section 2804(a)(2).  Grounds for nonrenewal of a franchise relationship are set forth in Section 2804(a)(3).

In arguing that it is entitled to summary judgment as a matter of law, Rosedale places primary reliance on *Smith v. Atlantic Richfield Company,* 533 F.Supp. 264, 267 (E.D.Pa.), *aff'd,* 692 F.2d 749 (3rd Cir.1982).

In *Smith*, ARCO terminated an agreement with Smith for the operation of an am/pm convenience store because Smith refused to remove several coin-operated video games from the store's premises.  The convenience store was adjacent to an ARCO gasoline station operated by Smith under a separate lease.  Smith, relying

7

upon the fact that these two operations were conducted on the same premises, invoked the PMPA to enjoin the termination of the am/pm convenience store agreement.  ARCO moved to dismiss the action for lack of jurisdiction, contending that the case did not involve a franchise termination under the PMPA.  533 F.Supp. at 265.  In dismissing the action for lack of jurisdiction, the District Court ruled:[1]

> The PMPA on its face is clearly limited in scope to terminations of motor fuel franchises.  The text of the PMPA does not contain any provision justifying an extension of the Act to cover such things as a convenience store franchise.  Those provisions relevant to the definition of 'franchise' pointedly speak only of aspects of motor fuel franchises.  Obviously, plaintiff cannot rely solely upon the plain meaning of the PMPA to support his contention that the Act provides his suit with a federal jurisdictional foundation.
>
> Plaintiff, however, contends that the Convenience Store Agreement and the Premises Lease are so intertwined and interdependent as to constitute one franchise, so that termination of the Convenience Store Agreement amounts to termination of the Premises Lease, thereby bringing this case under the PMPA.  He observes, on the one hand, that if the Premises Lease terminates, so does the Convenience Store Agreement.  On the other hand, he points out that while the Premises Lease will survive termination of the Convenience Store Agreement, the Premises Lease's dormant provision for rental payments on the store will become operative, whereupon his royalty payments under the Premises Lease as a percentage of gross sales will be

---

[1] In *Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.*, 711 F.2d 138, 141 (9th Cir.1983), the Ninth Circuit disagreed with *Smith*'s ruling that questions relating to the PMPA's definitional sections are jurisdictional.

greater than what he was required to pay under the Convenience Store Agreement. Plaintiff argues that the purpose of this provision is not to increase ARCO's revenues, but to force termination of the motor fuel franchise while circumventing the PMPA's procedures.

Plaintiff also argues that it would be physically and economically impossible for the motor fuel franchise to continue to operate after the convenience store franchise has been terminated.  Plaintiff maintains that the convenience store and motor fuel operations are completely integrated and that the motor fuel operation is controlled by equipment located in the convenience store. His economic impossibility argument appears to be that the gasoline retail operation would be unprofitable without being complemented by a convenience store bearing the trappings of an 'am/pm' marketing scheme. Plaintiff concedes, however, that termination of the Convenience Store Agreement will not deprive him either of the lease to the store or the motor fuel distributing facilities. He also concedes that he may continue to operate a convenience store operation on the premises, without the use of the 'am/pm' trademark and marketing embellishments.

Plaintiff contends that the previously described physical and economic interrelationships suffice to bring termination of the Convenience Store Agreement under the PMPA because Congress intended that the scope of the definition of 'franchise' would be broad enough to preclude circumvention of the PMPA's strictures by termination of secondary arrangements.  To support his broad reading of the PMPA, plaintiff emphasizes a portion of the legislative history contained in a Senate Report which provides:

The term 'franchise' is defined in terms of a motor fuel trademark license.  It should be noted that the term is applicable only to the use of a trademark which is owned or controlled by a refiner.

9

> Secondary arrangements, such as leases of real property or motor fuel supply agreements are incorporated in the definition of a franchise.  Therefore, the substantive provisions of the title, relating to the termination of a franchise or nonrenewal of the franchise relationship, may not be circumvented by termination or nonrenewal of the real estate lease or motor fuel supply agreement which thereby renders the trademark license valueless.

Sen.Rep.No. 95-781, 75th Cong., 2d Sess., *reprinted in* [1978] *U.S. Code, Cong. & Ad. News* 873, 888.

Defendant, on the other hand, emphasizes the next sentence from this portion of the legislative history:

> The broader definition, however, is not intended to encompass other contractual arrangements which may exist between a franchisor and a franchisee, *e.g.,* credit card arrangements, contracts relating to financing of equipment, or contracts for purchase and sale of tires, batteries, or automotive accessories.

*Id.* In ARCO's view, although the legislative history indicates that Congress contemplated a broader definition of 'franchise' than is evidenced by the PMPA on its face, the Act, when read in its entirety, still does not cover termination of the Convenience Store Agreement.  According to ARCO, only secondary arrangements essential to the operation of a motor fuel franchise are covered by the PMPA, and the Convenience Store Agreement in contrast to such undertakings as a property lease or a motor fuel supply agreement, is not an essential secondary arrangement.

We agree with ARCO's reading of the legislative history and its assessment of the import of the Convenience Store Agreement to

plaintiff's motor fuel retail operation.  The legislative history cited to us indicates merely that the PMPA may not be circumvented by terminating secondary arrangements essential to the operation of the motor fuel franchise.  It does not indicate that all secondary arrangements are covered.  The critical question is whether the Convenience Store Agreement is essential to plaintiff's motor fuel franchise.

We conclude that plaintiff's arguments as to the physical and economic interrelationship between the two business operations are without merit.  It is clear as a matter of law that the Convenience Store Agreement is not a secondary arrangement essential to the operation of the motor fuel franchise. Termination of the Convenience Store Agreement therefore does not constitute termination of the motor fuel franchise and consequently we have no jurisdiction over the case.  Plaintiff's physical dependence argument is simply untenable.  Termination of the Convenience Store Agreement means only that plaintiff will lose his right to use the 'am/pm' trademark and the equipment and services supplied by ARCO in connection with its 'am/pm' franchising operations. Plaintiff will not lose the use of the premises nor the equipment necessary for the sale of motor fuel.  Plaintiff's conclusory allegations notwithstanding, termination of the Convenience Store Agreement will neither physically preclude nor inhibit continued operation of the motor fuel franchise.

Plaintiff's economic interdependence argument is likewise meritless.  Plaintiff asserts that increased payments under the Premises Lease will make it impossible for him to continue to operate the store.  We find such assertion baseless and of no legal effect. It is, of course, questionable whether plaintiff's obligations will indeed increase significantly.  But even if plaintiff's obligations increase, plaintiff conceded at oral argument that the economic pressures which would force it out of business are not attributable to ARCO, but are merely the same economic pressures faced by every gasoline

11

> retailer.  Moreover, regardless of
> plaintiff's lament about his commercial
> fortunes, ARCO is not an insurer of
> plaintiff's business, but merely its
> franchisor.
>
> It is also important to note that plaintiff
> does not assert that ARCO is attempting to
> use the competitive pressures which buffet
> plaintiff's business as a means of destroying
> his motor fuel franchise.  It would be
> difficult to make such an assertion in view
> of the fact that ARCO, in recognition of the
> adverse market conditions in the gasoline
> retailing industry, has voluntarily been
> accepting and will continue to accept a
> minimum rent far below what ARCO could
> rightfully demand under the Premises Lease.

*Id.* at 267-269.

Rosedale also cites *Han v. Mobil Oil Corporation*, 73 F.3d
872 (9th Cir.1995).  In *Han*, Han and Mobil entered into a Motor
Fuels Franchise Agreement which granted Han the right to use
Mobil's trademarks in connection with the sale of its motor fuel.
On the same day as the Franchise Agreement was to take effect,
Han and Mobil entered into a Reimbursement Agreement under which
Mobil agreed to reimburse Han for improvements made to the
gasoline station up to $101,100.00, after Han provided Mobil with
a second deed of trust on her residential property as security.
The Franchise Agreement contained a contractual limitations
provision.  Han made improvements to the gas station and
submitted requests for reimbursement to Mobil, all of which Mobil
denied.  Han brought suit against Mobil, alleging causes of
action for breach of contract, bad faith denial of the existence
of a contract, and breach of the covenant of good faith and fair

dealing.  The District Court granted summary judgment for Mobil

on the ground that Han's action was barred by the contractual

limitations provision contained in the Franchise Agreement.  The

Ninth Circuit affirmed the District Court, rejecting Han's

argument that the District Court improperly applied the

contractual limitations provision in the Franchise Agreement

since her claims were based on the breach of the Reimbursement

Agreement.  Although Han had not alleged a claim under the PMPA,

she argued that the PMPA's definitions of "franchise" and

"franchise relationship" mandate separate consideration of the

Franchise Agreement and the Reimbursement Agreement.  The Ninth

Circuit ruled:

> A 'franchise' includes the contracts or
> agreements that provide for the franchisee's
> use of a franchisor's trademark, the lease of
> a service station, and the motor fuel supply
> contract.  *Svela v. Union Oil Co. of*
> *California*, 807 F.2d 1494, 1500 (9th
> Cir.1987); 15 U.S.C. § 2801(1)(B).  The
> 'franchise relationship' is comprised of the
> respective obligations and responsibilities
> of a franchisor and a franchisee which result
> from the marketing of motor fuel under a
> franchise.  15 U.S.C. § 2801(2).  The
> 'franchise relationship' is 'an entity
> separate from, but defined by, the
> franchise,' or contractual arrangement
> existing between the parties.'  *Svela*, 807
> F.2d at 1500 ....

> The significance of this distinction is that
> the franchisor must renew the franchise
> relationship, not the franchise agreement *per*
> *se*, under the PMPA.  *Svela*, 807 F.2d at 1500.
> Indeed, the PMPA contemplates changes in the
> specific provisions of the franchise
> agreement at the time of renewal, requiring
> renewal only of the franchise relationship as
> distinguished from a continuation or

extension of the specific provisions of the franchise agreement.  *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1391 (9th Cir.1986).

Han asserts that because the PMPA narrowly defines the terms 'franchise' and 'franchise relationship,' a 'franchise agreement' should not be defined narrowly.  This would mean, she asserts, that a franchise agreement could not encompass matter outside the 'franchise relationship' and would require consideration of the Reimbursement Agreement separate and apart from the Franchise Agreement.

Han's position finds no support in the PMPA, or the decisions of this or any other circuit.  Franchise agreements may contain contractual arrangements that are not protected by the PMPA.[4] *See Valentine*, 789 F.2d at 1391-92 (PMPA does not prohibit redevelopment rider as part of franchise agreement, under which franchisor would have the right to switch to self-service station, and failure to renew franchise relationship based on failure to agree to redevelopment rider not violation of PMPA).  Indeed, franchise agreements governed by the PMPA are interpreted according to state contract law . . . .

. . .

The Reimbursement Agreement expressly states that it supplements the Franchise Agreement.  Indeed, the Reimbursement Agreement is dependent upon the Franchise Agreement.  The district court did not err in considering those portions of the Franchise Agreement not expressly superseded by the Reimbursement Agreement as applying to a claim involving the breach of the Reimbursement Agreement.

[4]The cases cited by Han are inapposite.  These cases relied on the limiting definition of 'franchise relationship' under the PMPA to preclude lawsuits for violations of that Act that involved breaches of supplemental contracts that were not components of the 'franchise.'  *See, e.g., Fresher v. Shell Oil Co.*, 846 F.2d 45, 46 (9th Cir.1988); *Smith v. Atlantic Richfield Co,* 533 F.Supp. 264, 268

14

(E.D.Pa.1982), *aff'd without op.*, 692 F.2d 749 (9th Cir.1983).

Rosedale suggests that BP should be estopped from asserting that the am/pm Agreement is an essential secondary agreement to the Gas Agreement based on the positions taken by ARCO in the *Smith* case:

> Based upon the very arguments BPWCP/ARCO has asserted in pleadings in the past, BPWCP is well aware that to nonrenew or terminate a motor fuel franchisee for the failure to enter into a new am/pm mini market franchise agreement is not material to the motor fuel franchise and violates the PMPA.

BP responds that *Smith* is distinguishable because "Rosedale ... is not challenging the nonrenewal and termination of the am/pm Agreement at all - it is expressly seeking to reject it." BP further asserts that market conditions and consumer preferences that were the basis for ARCO's business determinations in the early 1980s are distinct from today:

> ARCO's current policy of requiring existing am/pm operators to continue operating the am/pm convenience store to sell ARCO-branded fuel reflects its marketing strategy of promoting its successful am/pm concept in conjunction with the ARCO brand of gasoline.

Rosedale cites no authority from which it may be inferred that BP is bound by positions taken by ARCO in a separate lawsuit decided approximately 27 years ago. Judicial estoppel may, if applicable, bar litigants from making incompatible statements in two different cases. *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.,* 555 F.3d 772, 778-779 (9th Cir.2008), citing *Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778, 783 (9th Cir.2001).

15

Determining whether judicial estoppel should be invoked is informed by several factors: (1) whether a party adopts a position clearly inconsistent with its earlier position; (2) whether the court accepted the party's earlier position, so that accepting the current position would create the perception that either the first or second court was misled and (3) whether the party would gain an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001).

However, whether the am/pm convenience store is material or essential to the motor fuel franchise presents a mixed question of fact that cannot be resolved as a matter of law on this record.  To renew the franchise relationship, BP must also do so on the basis of good faith determinations and in the normal course of business and not for the purpose of preventing renewal of the franchise relationship.  BP offers nothing but conclusory opinions on this subject.  The matter of whether the am/pm store is essential will require expert testimony in addition to that of the parties.

BP argues that Rosedale's contention that it cannot condition the renewal of the Gas Agreement to renewal of the am/pm Agreement is virtually identical to the dealer's claim rejected by the Ninth Circuit in *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388 (9th Cir.1986).

In *Valentine*, Valentine had operated a gas station under successive leases and retail-dealer contracts with Mobil, which

agreements constituted a franchise relationship under the PMPA. The gas station was full-service, in addition to selling gasoline and automobile accessories.  Valentine also repaired and serviced cars.  Another type of gas station, known as a pumper, was becoming prevalent in the industry.  There, gasoline is sold only to motorists willing to pump gas themselves; no one repairs cars or sells automotive products.  Instead, there is usually a convenience store that sells where groceries and sundries.  Mobil offered to renew Valentine's franchise.  The proposed franchise agreement contained changes in rent and hours of operation, as well as a "redevelopment rider" giving Mobil sole discretion to "mak[e] a substantial redevelopment of the premises which may include a change in configuration, and may include the elimination of the service bays."  Valentine rejected the redevelopment rider and contended that if Mobil had deleted the redevelopment rider, he would have accepted the remaining terms. Valentine sued Mobil under the PMPA claiming that the Act required Mobil to offer to sell Valentine the station at a fair price before it could end the franchise relationship.  The district court granted summary judgment for Mobil and the Ninth Circuit affirmed.

Valentine argued on appeal that the PMPA did not allow Mobil to materially restructure the business at the time of renewal. If Mobil wished to make such changes by removing the service bays and turning the station into a pumper, it was first required to offer to sell him the business pursuant to 15 U.S.C. §

2802(b)(2)(D), which provides that if the franchisor does not wish to renew the franchise because it has determined to materially alter, add to or sell the premises, it may decline to renew only after giving the franchisee an opportunity to buy the station.   The Ninth Circuit disagreed:

> Our review of the PMPA discloses no provision giving Valentine the right he asserts.   The Act, passed in 1978, responded to a widespread perception that the petroleum marketing industry was undergoing drastic changes, with a trend toward fewer stations, many of them pumpers.   Congress sought to correct what it perceived as an inequality in bargaining power between distributors of petroleum products and their franchisees by giving franchisees certain protections from arbitrary termination or nonrenewal .... A product of compromise, the PMPA affords franchisees important but limited procedural rights, while allowing franchisors significant latitude in responding to changing market conditions ....
>
> The portion of the PMPA dealing with protection of franchisees is Title I, codified at 15 U.S.C. §§ 2801-2806. Following definitions, contained in section 2801, section 2802 limits the grounds on which the franchisor may end the franchise relationship ... Section 2804 establishes procedures for termination or nonrenewal, giving franchisees an automatic 90 and sometimes 180 days' notice.   Section 2805 gives aggrieved franchisees a right of action in federal district court; if successful, they may obtain actual and exemplary damages, injunctive relief and attorney's fees. Section 2806 preempts inconsistent state laws dealing with termination and nonrenewal, except in specific, limited areas.
>
> On their face, none of these provisions gives a dealer the right to continue operating a service station in a particular fashion, or precludes a franchisor from altering the scope or operation of the business.

18

Valentine, however, argues that such restrictions can be inferred from the language of section 2803(b)(3)(D).  This section provides that the franchisor may refuse to renew the franchise relationship if it determines in good faith to sell, alter or convert the station, but only if it first offers the dealer an opportunity to purchase the property.  By its terms, however, this section addresses only the situation where the franchisor wishes to terminate the franchise relationship; it does not address this case, where Mobil reserves the right to convert the station but wishes to retain Valentine as a franchisee.

The PMPA plainly contemplates that franchisors will have substantial flexibility in changing the terms of a franchise upon renewal ... Thus, section 2801 defines two separate concepts: the 'franchise,' consisting of a specific contract between a franchisor and a franchisee, 15 U.S.C. § 2801(1); and the 'franchise relationship,' consisting of the mutual obligations and responsibilities between the parties arising from the marketing of motor fuel under a franchise.  *Id.* § 2801(2).  Under the PMPA, the franchisor has (absent specific cause) an obligation to renew the franchise relationship, *not* the particular franchise. Indeed, section 2802(b)(3)(A) contemplates the possibility of material changes in the terms of the franchise, allowing the franchisor to end the relationship if agreement cannot be reached with respect to such changes.

This reading of section 2802(b)(2)(A) does not, as Valentine suggests, vitiate the protections Congress intended franchisees to have under the PMPA.  Franchisors may not insist on arbitrary or pretextual franchise terms ... Any changes must be proposed by the franchisor on the basis of determinations made in good faith, in the normal course of business and not for the purpose of preventing renewal of the franchise relationship.  15 U.S.C. § 2802(b)(2)(A). The PMPA gives the franchisor the burden of establishing that the proposed changes meet

19

this standard.  *Id.* § 2805(c).

> Nor is Valentine correct in suggesting that the redevelopment rider gives Mobil a free hand to close up the gas station or convert it to some other type of business, forcing him out of gasoline marketing altogether. While the rider affords Mobil much flexibility in adapting the operation of the business to changing conditions, it may not go so far as to remove the gas pumps and turn the station into a parking lot.  The PMPA defines both 'franchise' and 'franchise relationship' as arrangements involving the sale of motor fuel.  15 U.S.C. § 2801(1), (2).  A decision by Mobil to cease operating the premises as a gas station would constitute a proposed termination of the franchise, triggering the protections of the PMPA.

789 F.2d at 1390-1391; *see also Svela v. Union Oil Co. of California*, 807 F.2d 1494, 1500-1501 (9th Cir.1987)(conditioning renewal of franchise relationship on conversion of a gas station from full-serve, which sells gasoline, tires, batteries, and other automotive accessories and services and repairs vehicles, to fast-serve, which only sells gasoline and is prohibited from operating a mechanic repair service, does not require franchisor to comply with 15 U.S.C. § 2802(b)(3)(D));  *Cinco J, Inc. v. Boeder*, 920 F.2d 296, 300 (5th Cir.1991) (following *Valentine* and *Svela* in holding that Section 2802(b)(3)(D)'s right of first refusal inapplicable where franchisor wanted to convert a full-service gas station into a convenience store with a self-service gas pump).

BP argues that these cases stand for the proposition that BP has the right, when the motor fuel agreement and the am/pm mini

market agreement come up for renewal, to condition the renewal of the franchise relationship on renewal of both agreements.  BP asserts that non-PMPA protected contractual arrangements can be part of the PMPA franchise relationship, which can be enforced by the franchisor.  At the hearing, BP argued that *Valentine, Svela,* and *Han* establish that there can be secondary agreements which are required as a condition of renewal of the franchise relationship, that do not need to be essential to the PMPA motor fuel agreement.   BP contends that *Smith* involved an entirely different issue, whether PMPA protections apply to the termination of an am/pm mini market agreement.

Rosedale argues that *Valentine* and *Svela* are not relevant to this action.  While these cases hold that nothing in the PMPA gives the franchisee the right to continue operating a service station in a particular fashion or precludes the franchisor from altering the scope or operation of the gas station, *Valentine* and *Svela* address a motor fuel service station protected under the PMPA, and not a franchised mini-market.  At the hearing, Rosedale argued that BP is bootstrapping the holding in *Valentine*. Rosedale already has a mini-market convenience store on its premises and asserts that it wants to market BP's motor fuel through the mini-market convenience store.  Rosedale simply does not want to be an am/pm franchised mini-market.  Rosedale contends that it is consistent with *Valentine*.

In *Millett v. Union Oil Company of California*, 24 F.3d 10 (9th Cir.1994), motor fuel franchisees sought compensation for

the goodwill value of their auto repair franchises in light of
the franchisor's failure to give them required notice of
nonrenewal mandated by the Washington Franchise Investment
Protection Act (FIPA).  The District Court ruled that FIPA's one-
year notice requirement was preempted by the 90-day requirement
of the PMPA.  The Ninth Circuit affirmed, holding that the auto
repair franchises were sufficiently related to the motor fuel
franchises to be covered by the PMPA, preempting the FIPA
goodwill provisions.  Starting with the definition of franchise
in Section 2801(1)(A), the Ninth Circuit ruled:

> We have previously interpreted this statutory
> test as defining '"[f]ranchise" as the
> combination of the franchisee's use of a
> franchisor's trademark, the lease of a
> service station, and the motor fuel supply
> contract.' *Svela v. Union Oil Co.,* 807 F.2d
> 1494, 1500 (9th Cir.1987).  This definition
> of franchise clearly encompasses the Unocal
> trademark and the Unocal motor fuel
> franchises.  However, the definition does not
> facially include such entities as the Protech
> repair shops.  *See Smith v. Atlantic
> Richfield Co.,* 533 F.Supp. 264, 267 ...
> Unocal relies on the statute's use of the
> phrase 'in connection with the sale,
> consignment, or distribution of motor fuel'
> to argue that the statutory definition does
> not preclude the PMPA's application to the
> Protech Agreements.  However, it is clear
> that Unocal cannot rely exclusively on the
> language of the PMPA to support its
> preemption argument.
>
> The legislative history is helpful in
> determining what Congress intended to include
> within the term 'franchise.'  The Senate
> Report on the PMPA clarifies the definition
> of franchise as follows:
>
> > The term 'franchise' is defined in
> > terms of a motor fuel trademark

license ... Secondary arrangements,
such as leases of real property or
motor fuel supply agreements, are
incorporated in the definition of a
franchise.  Therefore, the
substantive provisions of the
title, relating to the termination
of a franchise or non-renewal of
the franchise relationship, may not
be circumvented by a termination or
non-renewal of the real estate
lease or motor fuel supply
agreement which thereby renders the
trademark license valueless.  The
broader definition, however, is not
intended to encompass other
contractual arrangements which may
exist between a franchisor and a
franchisee, e.g., credit card
arrangements, contracts relating to
financing of equipment, or
contracts for purchase and sale of
tires, batteries, or automotive
accessories.

Senate Report, *supra*, at 888.  While defining
franchise in terms of a motor fuel trademark
license, the Senate Report makes clear that
the definition includes certain secondary
arrangements.  Given that the Protech
Agreements are likely not encompassed within
the PMPA's definition of franchise, the issue
becomes whether they can be considered
secondary arrangements and thus still fall
within the coverage of the PMPA.

Unfortunately, the Senate Report fails to
conclusively establish whether the Protech
Agreements are secondary arrangements
incorporated into the PMPA's definition of
franchise.  The Report mentions two types of
arrangements, real property leases and motor
fuel supply agreements, that are clearly
covered by PMPA.  The Report also specifies
certain agreements, such as credit card
arrangements, contracts relating to financing
of equipment, and contracts for the purchase
and sale of automotive accessories, that are
not incorporated into the definition of
franchise.  The Protech Agreements do not fit
into the category of arrangements that are

23

either specifically included, or specifically excluded, from the definition of franchise.

The statutory language and legislative history fail to clearly establish Congress' intent regarding the scope of the PMPA's definition of franchise. While these sources do not prohibit a finding that the Protech Agreements are secondary arrangements falling within the ambit of the PMPA, they also do not provide significant support for such a finding. Thus, we turn to the case law addressing secondary arrangements under the PMPA.

There have been several district court decisions addressing PMPA secondary arrangements. The three most important of these cases involve AM/PM mini-market franchises located on the same premises as ARCO motor fuel franchises. In *Smith v. Atlantic Richfield Company*, the court decided whether the PMPA's jurisdiction extended to prevent the termination of an AM/PM mini-market franchise located on the same premises as a motor fuel franchise. The court held that only secondary arrangements that were 'essential' to the operation of the motor fuel franchise were covered by the PMPA. *Smith*, 533 F.Supp. at 269. Finding as a matter of law that the mini-market was not essential to the motor fuel franchise, the court dismissed for lack of jurisdiction. *Id.* As noted by Unocal, however, *Smith* was not a PMPA § 2806(a) preemption case and did not involve the termination of a motor fuel franchise. Rather, the case dealt solely with the termination of a mini-market franchise.

A contrary result was reached in *Atlantic Richfield Co. v. Brown*, No. 85-C-5131 (N.D.Ill. Oct. 21, 1985), where the district court was faced with an arrangement whereby the nonrenewal of a premises lease and motor fuel lease automatically triggered termination of an AM/PM mini-market agreement. In holding that the PMPA preempts application of Illinois state law to the mini-market, the court reasoned that the Arco lease for the premises, fuel, and mini-market

24

were so inextricably linked that the PMPA
governed the secondary mini-market agreement
as well as the other two primary agreements.
The mini-market agreement was found to
reflect Arco's intent to permit franchisees
to sell groceries only as long as the
franchisee sells motor fuel.

In the third case, *Aurigemma v. Arco
Petroleum Products Co.,* 698 F.Supp. 1035,
1041 (D.Conn.1988), the PMPA was found not to
extend to an AM/PM mini-market franchise
connected with a fuel franchise where there
was insufficient interdependence between the
two franchises.  The court, concluding that
the requisite connection did not exist, noted
that '[t]he decision to withdraw from the
sale of petroleum products in Connecticut
does not necessarily vitiate the continued
operation of the AM/PM stores.'  *Id.*.  In
reaching this result, the court relied on two
factors: 1) an Arco manager testified that
the mini-markets could exist without
petroleum franchises; and 2) there were, in
fact, numerous AM/PM stores that operated
without the sale of petroleum products.  *Id.*

While reaching different conclusions, the
district courts in these three cases used a
similar methodology to determine the extent
of the PMPA's coverage.  Each court focused
on the degree of interrelation that existed
between the secondary franchise and the
franchises that were expressly controlled by
the PMPA.  *See Smith* ... (asking whether
secondary arrangement is essential to motor
fuel franchise); *Brown* ... (asking whether
secondary arrangement is inextricably linked
to motor fuel franchise); *Aurigemma* ...
(examining degree of interdependence between
secondary franchise and motor fuel
franchise).

Examining the arrangements presently at
issue, we conclude that the Protech
Agreements are sufficiently related to the
Unocal motor fuel franchises so as to be
covered by the PMPA.  The Protech system is
available only to Unocal motor fuel dealers
and nonrenewal of the motor fuel lease
automatically terminates the Protech

25

> Agreements.  Further, the Protech Agreement
> is subordinate to the motor fuel lease and in
> the event of an inconsistency, the motor fuel
> lease controls.  Appellants also made
> admissions regarding the linked nature of the
> two franchises.  On these facts, the decision
> to terminate the Unocal motor fuel franchise
> does 'necessarily vitiate the continued
> operation of the [Protech repair shops]' and
> the PMPA thus applies ....

*Id.* at 13-15.

The Ninth Circuit's analysis in *Millett* precludes resolution of the cross-motions for summary judgment as a matter of law. *Smith* is not binding on this Court.  *Valentine, Svela* and *Han* involved agreements closely related to the motor fuel franchise agreement.  The am/pm mini market is a source of complimentary product sales, but only directly interrelated and intrinsically linked by the control from the mini market of fuel supply, and dispensing and partial payment and accounting for fuel sales. The *Millett* analysis is apposite.  Whether termination and/or nonrenewal of the motor fuel franchise because of Rosedale's refusal to execute the AM/PM agreement violates the PMPA depends upon the degree of interdependence and interrelationship between the am/pm Agreement and the Gas Agreement.

In arguing that the am/pm Agreement is a separate franchise from the Gas Agreement and is not sufficiently interrelated to the Gas Agreement to constitute a secondary arrangement covered by the PMPA, Rosedale refers to the Franchise Disclosure Document issued by BP on March 24, 2008, which states in part:

> BP anticipates that *ampm* [sic] mini markets
> will be operated in connection with ARCO-

26

> branded gasoline retail establishments, although at BP's sole discretion, a number may not.  In either case, the *ampm* [sic] Mini Market will be patronized by the general public and will be in competition with other convenience stores and both large and small independent and chain stores, grocery stores, fast food outlets and *ampm* [sic] mini markets franchised or operated directly by BP.

Rosedale notes that the Franchise Disclosure Document does not state that an am/pm mini market franchise competes with other motor fuel stations.  Rosedale further contends that the am/pm Agreement contains its own provision for termination, that is independent and different from the termination and nonrenewal section in the Gas Agreement.  The am/pm Agreement provides that the Agreement may be terminated if BP fails to perform, by mutual consent, or by BP under specified circumstances, including "[a]bandonment of the am/pm mini market by Operator."  Section 18.05 provides that "[i]n the case of Concurrent Operations at the Premises, ARCO may terminate this Agreement upon termination of any one other franchise agreement."  Rosedale argues:

> [T]here is no similar provision in the ARCO branded motor fuel PMPA gas agreement that allows for termination of same in the event that a concurrent am/pm mini market franchise is terminated.  In fact, such a provision would contradict the very purpose of the PMPA that requires the continuance of the franchise for the sale of motor fuel.  15 U.S.C. § 2802(a).  Therefore, if termination or non-renewal of an am/pm mini market franchise cannot trigger the termination or non-renewal of the ARCO motor fuel agreement, then conversely, the ARCO PMPA motor fuel agreement cannot be terminated or non-renewed for a franchisee's refusal to renew the am/pm mini market franchise.

27

1    Contrary to BP's position on interdependence, Rosedale

2    points to a large number of BP fuel franchised gas stations (41)

3    that operate without an integrated am/pm mini market, which is

4    the best evidence of the non-secondary nature of the convenience

5    store to the fuel franchise and showing that the am/pm

6    convenience store is neither interdependent nor interrelated.

7    This presents an issue of material fact for the trier of fact.

8    Under the secondary arrangement analysis of *Millett,* BP

9    argues that the Gas Agreement and the am/pm Agreement are

10   interrelated in that ARCO expressly made both agreements part of

11   the "Renewal Contract."   BP asserts:

12           The two agreements provide for the operation
             of a single retail facility; they both
13           commenced upon construction of the facility;
             the required hours of operation are identical
14           for the fueling facility and convenience
             store (24 hours); customers not using the
15           point of sale equipment at the pump pay for
             their purchases inside the convenience store;
16           a single cashier in the convenience store
             receives payment for both gasoline and
17           convenience store purchases; and a single
             ARCO am/pm accounting system records the gas
18           and convenience store transactions ... In
             1997, when ARCO allowed Rosedale to brand its
19           new facility as an am/pm ARCO facility, ARCO
             would not have agreed to brand the Rosedale
20           facility as 'ARCO' if it had not included an
             am/pm franchise.

21
     BP asserts that, contrary to Rosedale's contention that Rosedale
22
     executed in 1998 separate and distinct assignments of the Gas
23
     Agreement and the am/pm Agreement, the assignment was in fact one
24
     document executed by Rosedale.   BP refers to the Assignment and
25
     Assumption of Non-Lessee am/pm Agreements dated April 6, 1998
26

                                    28

executed "between Supertino, Supertino, Turman Charitable Remainder Unitrust, a Partnership (individually or collectively 'Assignor'), and Rosedale Plaza Group, LLC, a Limited Liability Corporation (individually or collectively 'Assignee').  This document states that Assignor is a party to: (1) am/pm Mini-Market Agreement, dated November 6, 1997; (2) Contract Dealer Gasoline Agreement, dated November 6, 1997; and (3) Addendum to Contract Dealer Gasoline Agreement (Paypoint Network Non-Lessee Retailer, dated November 6, 1997; that Assignee acknowledges receipt of copies of each of these agreements, "which are collectively referred to here as the 'am/pm Agreements.'"

Rosedale and BP's present opposing factual arguments the trier of fact must resolve.  The cross motions for summary judgment on this issue are DENIED.

C.   <u>GOOD FAITH AND NORMAL COURSE OF BUSINESS</u>.

The parties respectively move for summary judgment on the issue whether BP's decision to require its franchisees with expiring *am/pm* Mini Market Agreements and PMPA Gasoline Agreements to renew both agreements in order to continue a PMPA franchise relationship, was made in good faith and in the normal course of business.

15 U.S.C. § 2802(b)(3)(A) provides:

> For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:
>
> (A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise,

29

          if  -

               (i) such changes or additions are
          the result of determinations made by the
          franchisor in good faith and in the normal
          course of business; and

               (ii) such failure is not the result
          of the franchisor's insistence upon such
          changes or additions for the purpose of
          converting the leased marketing premises to
          operation by employees or agents of the
          franchisor for the benefit of the franchisor
          or otherwise preventing the renewal of the
          franchise relationship.

     For Section 2804(b)(3)(A) to provide BP with an affirmative

defense, BP must prove that its decision to change the franchise

terms was made (i) in good faith and in the normal course of

business, and (ii) the changes were not made for the purpose of

preventing the renewal of the franchise relationship.  *See Svela

v. Union Oil Co. of California*, 807 F.2d 1494, 1501 (9th

Cir.1987).  This is a twofold test.  *Duff v. Marathon Petroleum

Co.*, 863 F.Supp. 622, 626 (N.D.Ill.1994).  The "good faith" test

is subjective and meant to preclude sham determinations from

being used as an artifice for termination or non-renewal.  *Id.;

see also Svela, id.*:

          These requirements preclude judicial second-
          guessing of the economic decisions of
          franchisors ... The legislative history of
          the PMPA indicates that courts should look to
          the franchisor's intent rather than to the
          effect of his actions, making this a
          subjective test ... Therefore, the fact that
          Union's proposed changes might make it
          difficult for Svela to remain in business and
          earn a profit is irrelevant to a finding of
          good faith ... The legislation was intended
          to provide franchisors with flexibility to
          respond to changing market conditions and

                              30

> consumer preferences ... 'So long as the
> franchisor does not have a discriminatory
> motive or use the altered terms as a pretext
> to avoid renewal, the franchisor has met the
> burden required by the PMPA for determining
> good faith.' ....

See also *Unocal Corp. v. Kaabipour*, 173 F.3d 755, 767 (9th Cir.), *cert. denied*, 528 U.S. 1061 (1999).

The "normal course of business" test requires that the changes be the result of the franchisor's normal decisionmaking process. *Duff*, *id.* These tests serve to protect franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the franchisor's business judgment itself. *Id.*

Questions of subjective intent are considered proper issues for the jury and good or bad faith which are to be inferred from all the circumstances involved in the particular case are inherently factual inquiries. Subjective intent is usually a matter of inference to be derived from all of the objective facts and evidence. *Tiller v. Amerada Hess Corp.,* 540 F.Supp. 160, 165 (D.S.C.1981).

Rosedale argues that a "constant theme developed in PMPA cases when looking to objective facts and evidence is whether the franchisor treats all of its' franchisees in a uniform manner." Rosedale contends that, "[i]f the franchisor singles out one franchisee and does not renew his, her, or its motor fuel contract but renews another franchisee's motor fuel contract under similar conditions, such action is indicative of bad faith.

31

1  Rosedale cites *Tiller v. Amerada Hess Corp., supra,* 540 F.Supp.

2  at 165 ("While the uniform application of a rent increase is

3  evidence of good faith on the part of the franchisor, it is in

4  and of itself not conclusive on the issue of good faith");

5  *Valentine v. Mobil Oil Corp.,* 614 F.Supp. 33, 39 (D.Ariz.1984),

6  *aff'd,* 789 F.2d 1388 (9th Cir.1986)("Mobil maintains that its

7  rider is incorporated in all of its new and renewed lease

8  packages.  This is no showing that Valentine was treated

9  differently from other dealers").  Rosedale argues that it is

10  entitled to summary judgment as to BP's affirmative defense on

11  the ground of bad faith:

12          BP ... has attempted to require that this
           Plaintiff renew its am/pm mini market
13          franchise in order to keep its PMPA protected
           fuel supply agreement with no offer of
14          compromise.  Rather an offer of extremely
           different and new terms which include
15          suffocating restrictions and waivers of legal
           rights while waiving same for the only other
16          ARCO branded franchisee who complained was
           instead conveyed.  The new and additional
17          terms which BP ... is requiring include a
           waiver of legal rights under the PMPA,
18          federal and state law and dramatically higher
           costs of doing business, fees and royalties
19          associated with the am/pm mini market
           franchise.  These additional terms will cause
20          Plaintiff to operate its station at a much
           reduced profit level (if any profit at all)
21          than if the convenience store were not
           branded am/pm.    ....
22
           BP ... is also requiring the addition of the
23          above-cited terms with knowledge that
           currently, at least seventy-one other ARCO
24          sites sell ARCO branded fuel without an am/pm
           mini market convenience store on the premises
25          ... It is unclear why BP ... allows at least
           ... 71 ... other sites to operate the same
26          way Rosedale wishes to (and has waived the

1
2
3

'new policy' for the only other ARCO branded franchisee who complained), yet, chose to terminate Rosedale for its attempt to avail itself of the very same rights.

BP responds that the fact that the new terms might make it more difficult for Rosedale to make a profit is not relevant to the determination of good faith. *Selva*, *supra.* Secondly, BP presents evidence for the reason Mr. Halloum was allowed to continue with the Gas Agreement even though he did not renew his am/pm Marketing Agreement, i.e., that Mr. Halloum had already expended monies to develop a Subway franchise before BP's new policy was implemented. Finally, a substantial number of ARCO franchises never did have a mini market associated with them.

The parties' cross motions on the issue of good faith are DENIED; genuine issues of material fact and the inferences to be drawn are issues for the jury to resolve.

The second part of the test is whether BP's action was taken in the normal course of business. Neither Rosedale or BP is entitled to summary judgment on this issue; the facts concerning the procedures followed by BP and business reasons for adopting the 2007 Policy are disputed.

The parties' cross motions on the issue of normal course of business are DENIED.

F.   <u>NOTICE OF TERMINATION</u>.

The parties respectively move for summary judgment whether BP's Notice of Termination met the PMPA's procedural requirements under 15 U.S.C. § 2804.

33

1      Section 2804(a) provides:

2           Prior to termination of any franchise or
            nonrenewal of any franchise relationship, the
3           franchisor shall furnish notification of such
            termination or such nonrenewal to the
4           franchisee who is a party to such franchise
            or franchise relationship -

5
                 (1) in the manner described in
6           subsection (c) of this section; and

7                (2) except as provided in
            subsection (b) of this section, not less than
8           90 days prior to the date on which such
            termination or nonrenewal takes effect.

9
Section 2804(c) provides:

10
            Notification under this section -

11
                 (1) shall be in writing;

12
                 (2) shall be posted by certified
13          mail or personally delivered to the
            franchisee; and

14
                 (3) shall contain -

15
                      (A) a statement of
16          intention to terminate the franchise or not
            to renew the franchise relationship, together
17          with the reasons therefore;

18                    (B) the date on which
            termination or nonrenewal takes effect; and

19
                      (C) the summary statement
20          prepared under subsection (d) of this
            section.

21
       BP sent a document captioned "<u>NOTICE OF TERMINATION</u>" by hand

22
delivery and certified mail to Rosedale on September 30, 2008,

23
which states:

24
            You are currently a party to an am/pm Mini
25          Market Agreement ('am/pm Agreement'),
            effective November 6, 1997 and a Contract
26          Dealer Gasoline Agreement ('Gasoline

                                  34

Agreement'), also effective November 6, 1997,
and various related agreements (collectively,
the 'Agreements'), assigned and assumed by
you on April 6, 1998 with BP West Coast
Products LLC ('BPWCP') then known as Atlantic
Richfield Company ('ARCO'), concerning the
above facility located at 7851 Rosedale Hwy.,
Bakersfield, California.   (Facility # 81838)
(the 'Facility').

PLEASE TAKE NOTICE that the Agreements and
the petroleum franchise created thereunder
shall terminate in ninety days, on <u>December
30, 2008</u>, for the reasons set forth below.

After many weeks and direct discussions with
BPWCP representatives, you informed us that
you would not sign the renewal package
provided to you on July 28, 2008.

As a result of your actions, you have failed
to agree to material terms of the contract in
violation of Article 19 of the am/pm Mini
Market Agreement.

You are also in violation of Section 17.2 of
the Contact [sic] Dealer Gasoline Agreement
for failure to agree to changes or additions
to your franchise relationship with BPWCP.

...

The above stated conduct also provides a
valid basis for termination of your petroleum
franchise in accordance with the Agreements
and the Petroleum Marketing Practices Act
(PMPA), 15 U.S.C. § 2801 *et seq.*  A summary
Statement of the PMPA is attached to this
Notice.

The particular provisions of the PMPA
relevant to this termination are: 1) failure
by the franchisee to comply with a reasonable
and material provision of the franchise
(§2802(b)(2)(A)]; and 2) occurrence of an
event which is relevant to the franchise
relationship and as a result of which
termination of the franchise relationship is
reasonable [§2802(b)(2)(C)].

....

35

It is undisputed that BP's Notice of Termination was written, posted by certified mail and hand-delivered, accompanied by a summary statement, and received more than 90 days before it became effective.  This constitutes compliance with the procedural requirements of § 2804(c).

There is a split of legal authority regarding compliance with the statutory notice requirements, as recognized in *dicta* in *Herman v. Charter Marketing Co.,* 692 F.Supp. 1458, 1461 (D.Conn.1988):

> The early cases which studied the issue of whether strict compliance with the notice provisions of the PMPA was required held that such was implicitly required inasmuch as Congress had not provided the courts with any power to cure a defective notice.  *See Blankenship v. Atlantic-Richfield Co.,* 478 F.Supp. 1016, 1018 (D.Ore.1979) [and other cited cases].  The later cases, however, have opted for a less strict reading of the statute holding that *Blankenship* and its progeny exalt form over substance ....
>
> A requirement of strict adherence to the notice provisions eliminates after-the-fact factual disputes, but runs the risk of exalting form over substance.  A rule allowing greater flexibility prevents a franchisor from being held liable for failure to memorialize what was actually communicated to the franchisee, but risks the uncertainty of resolving a factual dispute as to the notice actually given.

Rosedale asserts that "the overwhelming authority holds that the PMPA notice requirements be strictly construed and that such strict construction must be applied to this analysis."  Rosedale cites *Pruitt v. New England Petroleum L.P.,* 2006 WL 3332773 (D.Conn.2006):

The Court rejects NEPLP's contention that it need only give a franchisee 'reasonable notice' to comply with the PMPA. Courts construe the PMPA notice requirement strictly. *Ceraso*, 326 F.3d at 314; *Escobar v. Mobil Oil Corp.*, 678 F.2d 398, 400 n.2 (2nd Cir.1982). The franchisor must give ninety days' notice to terminate a franchise relationship unless that period of time is 'unreasonable.' *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 60 (2nd Cir.1984). The ninety day requirement 'should not be lightly excused.' *Id.* Legislative history indicates that Congress added the exception to the notice requirement in 15 U.S.C. § 2804(b)(1)(A) for circumstances when a franchisee committed such violations of the franchise agreement that a lengthy notice period would significantly harm the franchisor. *See id.* Unless that statutory exception applies, NEPLP's eighty-nine day notice is not excused by its assertion that it provided 'reasonable notice' of termination to Pruitt.

Rosedale cites *Blankenship v. Atlantic-Richfield Co.*, 478 F.Supp. 1016, 1018 (D.Or.1979), where the District Court also strictly construed the 90 day notice requirement set forth in Section 2804(a)(2). Rosedale also cites *Davy v. Murphy Oil,* 488 F.Supp. 1013, 1016 (W.D. Mich.1980). There the District Court ruled that a notice stating that the franchisee would be contacted to discuss the terms of a new lease did not adequately advise the franchisee of the specific reasons for the nonrenewal or permit the franchisee to determine whether or not the provisions of the PMPA had been complied with.

BP asserts that, although "some early PMPA decisions strictly construed the notice requirements to the four corners of the notice documents, in more recent cases courts have moved away

from such a rigid construction of the statute and focus instead on whether the franchisee was fairly apprised of the reasons for termination/nonrenewal."  BP cites *Graeber v. Mobil Oil Corp.*, 614 F.Supp. 268 (D.N.J.1985).  In *Graeber*, Mobil's termination notice stated the date on which the termination or nonrenewal would take effect and set forth the summary statement as required by Section 2804(c)(3)(B) and (C).  The notice further stated:

> The expriation [sic] of Mobil's underlying lease also provide [sic] grounds for the nonrenewal [sic] of our franchise relationship under the Petroleum Marketing Practices Act.  Pursuant to 15 U.S.C. Sec. 2802(b)(3) [sic], Mobil elects to and hereby terminates said franchise relationship with you effective March 31, 1985.

614 F.Supp. at 275-276.  The District Court noted that Mobil's "subparagraph (A) compliance is not ... self-evident."  *Id.* at 276.  The District Court ruled:

> Mobil advised on *nonrenewal* when it meant to advise of *termination*.  Accordingly, Mobil cited § 2802(b)(3) when it should have cited § 2802(b)(2)(C) and (c)(4).  Mobil's expression was similarly confused in the paragraph which preceded the one quoted above.  There, Mobil reminded the plaintiff that loss of its underlying lease provided grounds for *termination*, ... but concluded: 'Accordingly, Mobil elects to and hereby *nonrenews* its Retail Dealer Contract and Service Station Lease with you effective March 31, 1985.' ... The PMPA distinguishes clearly between the termination and the nonrenewal of a franchise agreement.  *See* 15 U.S.C. § 2802(b)(2) & (b)(3).  Paragraph 14 of the RDC between Mobil and the plaintiff does so as well.  Mobil's notice of termination does not.
>
> In enacting the PMPA, Congress set out to provide franchisees with 'meaningful

38

protections from arbitrary or discriminatory terminations.' ... Nevertheless, 'Congress chose to allow a franchisor to terminate a franchise when an underlying lease expires without making a further showing that the decision was made in good faith or in the exercise of reasonable business judgment.' ... Section 2802(c)(4) and its legislative history effectively define termination, due to an election not to renew an underlying lease, to be reasonable.  The rule that unambiguous statutory language is ordinarily conclusive is an important corollary to the establishment of Congress as the law making body and the judiciary as the law interpreting body.  Thus, we may not ask Mobil to justify its decision not to renew its underlying lease or to provide notification not required by statute.  We can only determine whether it adequately noticed the plaintiff of the existence of an underlying lease and of the expiration of the same.

Mobil's termination notice confused the termination and nonrenewal decisions as well as the associated statutory citations.  Thus, plaintiff did not complain frivolously of deficient notice.  Nevertheless, the termination notice contained all of the necessary information and its import was certainly not lost on the plaintiff, as his subsequent actions demonstrate. *Cf. Davy v. Murphy Oil Corp.,* 488 F.Supp. 1013, 1016 (W.D.Mich.1980)(franchisor's intention to terminate was not clearly expressed).  Plaintiff knew when and why his franchise agreement would terminate.  We shall not construe § 2802(c) in an unreasonably rigid fashion in order to compensate for our inability to append subparagraphs (b)(2)(C) and (c)(4) of § 2802.

*Id.*

BP also cites *Dandy Oil, Inc. v. Knight Enterprises, Inc.*, 654 F.Supp. 1265, 1270 (E.D.Mich.1987), *appeal dismissed*, 830 F.2d 193 (6th Cir.1987):

39

10.   In general, franchisors must comply strictly with the notice provision.   *E.g., Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1211 (7th Cir.1984).

11.   The notice must adequately advise a franchisee of the specific reasons for the termination and enable the franchisee to determine whether the franchisor complied with the provisions of the PMPA.   *Svela v. Union Oil Co. of California*, 807 F.2d 1494, 1498-1500 (9th Cir.1987); *Davy v. Murphy Oil Corp.*, 488 F.Supp. 1013, 1016 (W.D.Mich.1980).

12.   In reviewing the adequacy of Knight's notice of termination to Dandy, this Court may consider the import of that notice on Dandy, as shown by Dandy's subsequent actions.   *See Graeber v. Mobil Oil Corp.*, 614 F.Supp. 268, 276 (D.N.J.1985).

13.   The fact that Knight's notice gave Dandy's purported failure to purchase sufficient amounts of gasoline as the reason for termination of the franchise, instead of misbranding and trademark infringement, does not bar Knight in this case from asserting the latter defense.   Dandy was aware of its actions upon which Knight based its termination; but for Dandy's substitution of unbranded gasoline for Union 76 gasoline, Dandy's stations would have purchased a greater share of Union 76 gasoline.

14.   Moreover, Dandy has not shown that it was unable to determine whether Knight had complied with the PMPA.   Knight stated in its notice to Dandy that it intended to terminate the franchise based on § 2802(b)(2)(C) of the PMPA.   Nor can Dandy claim any prejudice due to a lack of sufficient notice.   Dandy has steadfastly maintained throughout this litigation that it will continue to sell unbranded gasoline at all of its stations, including its Unocal branded stations.

Rosedale argues that the Notice of Termination is defective notwithstanding BP's anticipated argument that the Notice "may

have been intended to be a notice of *nonrenewal,* because it specifically indicated that BPWCP intended to *non-renew* the franchise, rather than *terminate* it." Rosedale contends that the distinction between termination and nonrenewal is important because terminations are governed by Section 2802(b)(2), while nonrenewals are governed by Section 2802(b)(3). Rosedale asserts:

> [U]nder § 2802(b)(2)(terminations), a termination is permitted against a franchisee who fails to comply with 'any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship ...' 15 U.S.C. § 2802(b)(2)(A).

> Under § 2805(b)(3)[sic] (nonrenewals), a nonrenewal of a franchise is permitted if there is a 'failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business ...' 15 U.S.C. § 2802(b)(3)(A).

> It is also important to note that a 'termination' can only occur 'prior to the conclusion of the term, or the expiration date, stated in the franchise.' 15 U.S.C. § 2802(a)(1). A 'nonrenewal' however must necessarily occur prior to it being 'renewed.' 15 U.S.C. § 2802(a)(2).

Rosedale argues:

> Given that BPWCP has given a notice of 'termination,' rather than one of 'nonrenewal,' it has necessarily 'renewed' ROSEDALE's PMPA motor fuel supply agreement. Consequently, its termination of that agreement must be examined pursuant to the grounds for termination enumerated under § 2802(b)(2), rather than § 2802(b)(3). As such, it is irrelevant for the purposes of

1         this analysis that ROSEDALE has decided not
2    to enter into the subject am/pm mini-market
    agreement with BPWCP.  Moreover, since the
3    PMPA fuel supply franchise has already been
    renewed, BPWCP cannot reasonably argue that
4    ROSEDALE's refusal to enter into the am/pm
    agreement is a failure to comply with any
5    provision of the renewed fuel supply
    agreement.

6    Rosedale reiterates its position discussed above that the failure

7    to execute the am/pm Agreement is not a ground for termination of

8    the motor fuel agreement set forth in Section 2802(b)(2).

9    Rosedale contends:

10       BPWCP does not set forth proper grounds for
    termination as required under PMPA §
11   2802(b)(1)(B), but rather, BPWCP presents a
    'take it or leave it' method of extortion in
12   order to force the Plaintiff to accept the
    terms BPWCP unlawfully presented within the
13   new franchise agreements.

14       Because BPWCP did not provide ROSEDALE with a
    proper notice, containing proper grounds for
15   termination under the PMPA, judgment must be
    entered in favor of ROSEDALE, with a finding
16   that it can continue its ongoing franchise
    relationship with BPWCP without interruption.
17
    Rosedale's complaint that the Notice of Termination was
18
based on a "take it or leave it" proposal is not a ground for
19
violation of the PMPA.  *See Svela v. Union Oil Co. of California,*
20
*supra*, 807 F.2d at 1499:
21
    '[T]ake it or leave it' notices ... comply
22       with the PMPA when the franchisor's decision
    rests on economic grounds.
23
    BP argues that it is entitled to summary judgment on this
24
claim, contending that Rosedale's arguments are misplaced because
25
the Notice of Termination adequately set forth the reasons for
26

42

nonrenewal and termination of the franchise relationship, and the omission of the term "nonrenewal" is not fatal to the Notice.

BP cites *Svela* v. *Union Oil Company of California*, *supra*, 807 F.2d at 1499-1500:

> A nonrenewal letter must indicate by its language which section of the PMPA provides the grounds for nonrenewal, and grounds not included in the notice may not be relied upon. *See Khorenian v. Union Oil Co. of California*, 761 F.2d 533, 535 n.1 (9th Cir.1985). The purpose of this requirement is to allow the franchisee to determine his rights under the PMPA:
>
> > [W]here a notice of termination *does* use language found in [a specific code section], a franchisor should not thereafter be allowed to argue that by using said language it really meant something else. The franchisee's rights vary under the PMPA in relation to the ground relied on by the franchisor.
>
> *Midwest Petroleum Co. v. American Petrofina, Inc.*, 603 F.Supp. 1099, 1123 (E.D.Mo.1985) ....
>
> At trial, Union relied on section 2802(b)(3)(A), the failure of the parties to agree to changes in the provisions of the franchise, as the ground for its nonrenewal of Svela's franchise relationship. The district court held that this section did provide ground for nonrenewal, since Svela refused Union's offer of a fast-serve lease. Svela contends that this ground was not stated in Union's notice of nonrenewal, and therefore Union could not depend on it at trial.
>
> *Khorenian* and *Midwest* are distinguishable from the present case. In *Khorenian*, one of the grounds the franchisor sought to rely on was not mentioned in any way in the letter of nonrenewal; reliance upon this ground was not allowed. 761 F.2d at 535 n.1. In *Midwest*,

43

the franchisor argued that its use of one
section's language did not limit it to those
grounds, and that the franchisee's actual
knowledge of the other grounds provided
adequate notice.  603 F.Supp. at 1122.  In
contrast, Union's notice contained precise
language: if Svela agreed to a fast-serve
lease his franchise would be renewed, and if
he did not agree, his franchise would not be
renewed.  Thus, while Union's letter did not
track the language of section 2802(b)(3)(A),
it was clear that the failure to agree to
Union's new franchise terms would cause a
nonrenewal of the franchise relationship.
*See also Baldauf*, 553 F.Supp. 408, 416-17
('take it or leave it' proposal provides
grounds under 2802(b)(3)(A); *Meyer*, 541
F.Supp. 321, 330 (same).

Relying on *Svela*, BP argues that Rosedale cannot claim that

a sufficient reason was not provided in the Notice of

Termination:

The Notice plainly states that Rosedale's
failure to agree to the changes or additions
to the franchise relationship was a reason
for 'termination.' ... In addition, the
Notice expressly referred to the nonrenewal
section of the Gas Agreement, Section 17.2
(with language similar to that of PMPA
Section 2802(b)(3)(A)) providing that:

ARCO may nonrenew this Agreement
upon ... [b]uyer's failure to agree
to changes or additions to its
franchise relationship with ARCO,
which ARCO requests based upon
ARCO's determinations made in good
faith and the normal course of
business and without the purpose of
preventing the renewal of the
franchise relationship ....

BP further argues that, even if the Notice of Termination is

construed only to permit termination, the Notice properly set

forth ARCO's intent to terminate the franchise relationship.  BP

44

cites *Svela*, *supra*, "a nonrenewal letter must state an intention to terminate and include the reasons for nonrenewal.  15 U.S.C. § 2804(c)(3)(A).  So long as these requirements are met, even conditional language is permissible."  807 F.2d at 1499.  BP contends:

> Here, because Rosedale did not agree to
> renewal terms, the franchise relationship
> continued on a month-to-month basis until
> terminated on December 30, 2008, pursuant to
> the Notice.  Moreover, Rosedale's failure to
> agree to new terms in the franchise
> relationship constituted the occurrence of an
> event which made termination of the
> relationship reasonable under Section
> 2802(b)(2)(C) of the PMPA and Section 17.2 of
> the Gas Agreement.

BP argues that the Court may consider the adequacy of the Notice to Rosedale by Rosedale's subsequent actions.  BP refers to the allegations in Paragraphs 21, 23, 24, 32b, 32c, 33 and 37 of Rosedale's Complaint making reference to ARCO's nonrenewal of the franchise and the corresponding PMPA statutory citations as demonstrating Rosedale's knowledge of Arco's intent to nonrenew; to Rosedale's references in Paragraphs 25, 27 and 32 to Arco's action in this case as a "nonrenewal/termination;" and the allegation in Paragraph 16 that the "Notice of Termination" may be a Notice of Nonrenewal.  BP refers to Rosedale's argument in support of its motion for preliminary injunction that, under Section 2802(b)(3)(A), one of PMPA's nonrenewal provisions, that ARCO's action was an improper nonrenewal, thereby evidencing that Rosedale was on notice of the reasons for the termination/nonrenewal and able to determine its rights under the

45

PMPA.   In a footnote, BP contends that Rosedale has knowledge of the facts and circumstances that precipitated the Notice in this case:

> On July 28, 2008, ARCO personally delivered to Rosedale a '45 Day Renewal Letter' that accompanied the 'Renewal Contract' (including the *am/pm* Agreement and Gas Agreement) and enclosed a PMPA summary statement. (Lane Dec. (Docket No. 18), ¶ 3, Ex. A).  Rosedale personally acknowledged receipt of the same. (Id.)  In the 45 Day Renewal Letter, ARCO stated that failure to execute the Renewal Contract within the time frame may result in the nonrenewal of the franchise relationship (Id.).  The letter stated that the Renewal Contract contained changes from the current agreement, and further stated that should Rosedale elect not to execute the Renewal Contract due to the changes, ARCO had the right to refuse to renew the current agreement pursuant to the terms of PMPA section 2802(b)(3)(A) for failure to agree to changes or additions to provisions of the franchise.

Finally, BP, relying on *Graeber*, *supra*, argues:

> Similarly, here, ARCO provided adequate notice of nonrenewal/termination and reasons for the same, although not specifically termed a nonrenewal.  Where, as here, ARCO's Notice adequately set forth the reasons for nonrenewal and termination of the franchise relationship, such notice complied with the PMPA.

The parties' cross motions for summary judgment whether BP's Notice of Termination met the PMPA's procedural requirements under section 2804 are DENIED.  Recent case law negates Rosedale's argument that strict compliance as to termination or non-renewal is required.  However, whether the Notice of Termination in fact provided adequate notice to Rosedale of the

46

basis for BP's actions raises a question of fact for the jury.

## CONCLUSION

For the reasons stated:

1.   The parties' cross motions for summary judgment are DENIED.

IT IS SO ORDERED.

Dated:    October 13, 2009                  _____ /s/ Oliver W. Wanger _____
                                             UNITED STATES DISTRICT JUDGE

47